Pauline DAVIS, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The NEW YORK CITY HOUSING AUTHORITY, Defendant.

United States of America, Plaintiff,

v.

The New York City Housing Authority, Defendant.

Nos. 90 Civ. 0628 (RWS), 92 Civ. 4873 (RWS).

United States District Court, S.D. New York.

Aug. 11, 1999.

The Legal Aid Society Civil Division, New York City, for plaintiffs, by Helaine Barnett, Attorney–in–Charge, Scott A. Rosenberg, Director of Litigation, Judith Goldiner, of counsel.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York City, for United States of America, by Neil M. Corwin, Assistant U.S. Attorney, of counsel.

Jeffrey Schanback, General Counsel, New York City, for defendant New York City Housing Authority, by Henry Schoenfeld, Nancy M. Harnett, Stephen W. Goodman, James R. Adolf, of counsel.

*OPINION*

SWEET, District Judge.

Once again before the Court, this time on remand, is the motion by Pauline Davis, et al (the "Davis Plaintiffs") to enjoin the defendant New York City Housing Authority ("NYCHA" or the "Authority") from implementing the Working Family Preference ("WFP") contained in its proposed changes to its Tenant Selection and Assignment Plan ("TSAP") incorporated by reference in the Consent Decree in this action. In addition, NYCHA has moved to lift the preliminary injunction previously issued. Upon the findings and conclusions set forth below, the motion of the Davis Plaintiffs is granted, and the preliminary injunction is made permanent. The NYCHA's motion is denied.

As will appear in greater detail below, this action from its inception has been hard fought, and the issues have been difficult and complicated. As the Consent Decree approaches its sunset,[1] the Davis Plaintiffs seek to employ its provisions to achieve remediation of the conditions which gave rise to the action, while NYCHA contends that the Consent Decree has achieved its purpose. While there clearly are conflicting contentions concerning the proposed changes in the TSAP, the underlying questions during this phase of the litigation concern the continued viability and scope of the Consent Decree. The resolution of those issues overshadow and underlie the specifics of the WFP controversy.

**Prior Proceedings**

The description of the prior proceedings contained in the opinion of the Court of July 18, 1997 (the "July 18 Opinion") remain relevant but need not be repeated.

Prior decisions include *Davis v. New York City Housing Authority*, 1992 WL 420923 (S.D.N.Y. Dec.31, 1992) (*Davis I*); *Davis v. New York City Housing Authority*, 1997 WL 407250 (S.D.N.Y. July 18, 1997) (*Davis II*); *Davis v. New York City Housing Authority*, 1997 WL 711360 (S.D.N.Y. Nov.13, 1994) (*Davis III*); *Davis v. New York City Housing Authority*, 166 F.3d 432 (2d Cir.1999) (*Davis IV*), familiarity with which is assumed. Those facts and prior proceedings relevant to the instant motion are set forth below.

The July 18 Opinion held that while the proposed WFP did not have an "adverse impact" on minority applicants, it would perpetuate past segregation in predominantly white projects and granted the Davis Plaintiffs a preliminary injunction prohibiting the adoption of the proposed WFP. The Court also granted NYCHA leave to apply for a modification of the injunction "upon a showing that the Working Family Preference will be implemented in a manner that will not affect desegregation in projects with a disproportionately high rate of white occupancy." *Davis II*, 1997 WL 407250 at *18.

The NYCHA filed a notice of appeal and moved for reconsideration. The motion for reconsideration was denied on November 13, 1997 on the grounds that on a motion to reconsider, the NYCHA "may not advance new facts, issues or arguments not previously presented to the court." *Davis III*, 1997 WL 711360 at *3 (internal quotations and citations omitted). However, the injunction was modified to permit NYCHA to implement the WFP "as proposed in any project where white families do not constitute more than 30 percent of the families at the project."[2]

1. By its terms, the Consent Decree entered on July 1, 1992, to which the United States of America was a party, will expire on January 1, 2001.

2. The July 18 opinion was narrowed to enjoin the WFP at only 21 NYCHA developments classified as "predominantly white" in the TSAP which was incorporated in the Consent Decree. "Predominantly white" is the term used for projects where more than 30% of the units are rented to white families. These projects are referred to as "Disproportionate Projects" and/or "Affected Developments" and these terms have become terms of art in this litigation.

*Id.* at \*5. NYCHA filed another notice of appeal.

On January 22, 1999, the Court of Appeals filed its opinion by Chief Judge Morey L. Sear, sitting by designation, vacating the July 18 Opinion, but leaving the preliminary injunction intact, "until the district court has had the opportunity to address these matters on remand." *Davis IV*, 166 F.3d at 438. In particular, the Second Circuit noted that paragraph 13 of plaintiffs' expert Dr. Cupingood's ("Dr.Cupingood") Second Affidavit,[3] and the July 18 Opinion, were deficient because:

(a) "it is unclear to which proposed change—project choice or working family preference, or both—plaintiffs' expert attributes the perpetuation of segregation." *Davis IV*, 166 F.3d at 437;

(b) the time period during which the purported impact of the proposed TSAP changes will allegedly occur is not specified. *See id.* at 436;

(c) there is no discussion of, or data reflecting, the so-called "existing trends" allegedly showing that additional white families admitted under the WFP will concentrate in predominantly white developments. *Id.;*

(d) the subsidiary facts and methodology underlying the ultimate finding are not adequately explained. *See id.;*

(e) plaintiffs' expert does not identify the precise numerical data underlying his opinion. *See id.* at 437;

(f) the names of the developments at which the WFP will allegedly perpetuate segregation is not identified. *See id.* at 436;

(g) plaintiffs' expert expressed no opinion as to whether the WFP will perpetuate segregation at ten of the developments covered by the injunction. *See id.;* and

(h) the number, fraction, or percentage of additional white families who will be admitted to each of the 21 developments as a result of the WFP is not stated. *See id.*

The remand was filed on February 18, 1999, a pretrial conference was held, and a hearing was held on June 18, 1999. Additional affidavits, memoranda and arguments were received through July 27, 1999, at which time which the matter was deemed fully submitted. Although offered, neither party sought to examine or cross-examine any of the witnesses, expert or otherwise.

### The Scope of the Remand

Initially the Court of Appeals stated: "we consider Judge Sweet's findings on the issue of perpetuation of segregation insufficient under Rule 52(a). While not entirely devoid of detail, Judge Sweet failed to adequately explain the subsidiary facts and methodology underlying the ultimate finding." *Davis IV*, 166 F.3d at 436. In particular, the number of white families projected to be admitted to the projects at issue was found wanting.

---

**3.** In paragraph 13 of Dr. Cupingood's Second Affidavit he states:

I was also asked to calculate the effect that the proposed changes to the TSAP would have on slowing down the desegregation in projects which were more than 50 percent white as of June 1996. Information supplied to me indicated that the following 11 projects were more than 50 percent white as of June 1996—Berry, Cassidy–Lafayette. Forrest Hills, Independence, Middletown Plaza, New Lane, Robbins Plaza, South Beach, Taylor–Wythe, Todt–Hill, and Williams. Some of these projects are affected by the Davis Consent Decree. For these "Davis" projects, I first conservatively

assumed that all units set aside for Davis tenants would represent replacement for white tenants. Then assuming the turnover rates and move-in rates from Appendix E of [NYCHA expert] Dr. Peterson's affidavit continued and that the proposed changes to the TSAP were adopted, I calculated that a) there would be no further desegregation at four of the projects, b) the desegregation would be reversed at four other projects, and c) the desegregation would be slowed significantly at three projects. Thus, adoption of the proposed changes to the TSAP would adversely affect the desegregation at these majority white projects.

The Court of Appeals was also unable to determine whether paragraph 13 of the affidavit of Dr. Cupingood, which was adopted by the district court as a finding, reflected changes discussed were attributable to which proposed change—project choice, the WFP, or both.

The Court of Appeals also had difficulty in determining the source of statistics underlying Dr. Cupingood's ultimate finding that the proposed WFP would perpetuate segregation at certain NYCHA developments. For these reasons, the Court concluded Dr. Cupingood's affidavit was so "vague and conclusory" as to permit the discovery of relevant matters from the record and required remand "for proceedings consistent with this opinion."

Although the Authority did not appeal on the basis of a failure to conduct an evidentiary hearing, the Court pointed out "when a factual issue is disputed, oral testimony is preferable to affidavits."

The Court recognized that NYCHA's position that the effect of the TSAP on segregation was *de minimis* was advanced after the filing of the notice of appeal and had not been dealt with by the district court, but noted that on remand the proper standard to be applied is "whether the proposed working family preference will *significantly* perpetuate segregation at the relevant NYCHA developments." *Davis IV*, 166 F.3d at 438 (emphasis in original).

### The Facts

Based upon the hearing, the facts set forth in the affidavits of Dr. Cupingood and Dr. David W. Peterson (N.Y.CHA's expert witness) ("Dr.Peterson") are supported by the data cited and are credible, although certain of the conclusions drawn from these facts remain in contention. The facts as set forth below are found on the basis of the prior proceedings and the affidavits of the parties and the experts.

Neither of the parties sought a hearing to challenge the process by which the following facts were established.

### A. *The Consent Decree*

In 1992, NYCHA, the Davis Plaintiffs and the United States entered into a Consent Decree permanently enjoining various racially discriminatory tenant selection and assignment practices at NYCHA's public housing projects. (Consent Decree ¶ 4(a) –(h)). The Consent Decree provided *inter alia* for: (1) injunctive relief barring future housing discrimination on the basis of race, color or national origin, (Consent Decree ¶ 4); (2) the implementation of a new TSAP which substantially revised NYCHA's tenant selection and assignment systems, and which prohibits further discrimination, (Consent Decree ¶¶ 5–9); (3) remedial relief for 2,190 claimants of NYCHA's past discrimination,[4] (Consent Decree ¶¶ 10–39); and (4) significant record keeping and reporting by NYCHA regarding tenant selection and assignment practices. (Consent Decree ¶¶ 43–48).

The Consent Decree also requires NYCHA to "adopt and implement the TSAP ... to prevent any unlawful discrimination on the basis of race, color, or national origin, in compliance with the Housing Authority's obligations therewith under Title VI, the Fair Housing Act and the implementing regulations and requirements of HUD." (Consent Decree ¶ 5). In adopting and implementing the TSAP with "respect to existing projects and new projects to be opened in the future," NYCHA agreed that it would use "no racial quota system, or other practice technique or device to house Applicants in particular projects, buildings, or apartments, or to otherwise limit the availability of housing, on account of race, color, or national origin." (Consent Decree ¶ 7(a)).[5]

---

**4.** The remedial relief consisted of awarding HUD Section 8 housing vouchers to 200 claimants; the remaining 1,990 victims received priority placement at any of 31 so-

called "Affected Developments" where past segregation occurred.

**5.** The TSAP was designed "to assure that [the Housing Authority] receives and processes ap-

**225**

Under the Consent Decree, NYCHA's TSAP must remain in effect for at least five years (Consent Decree ¶ 6(a)) and during that time, the Plaintiffs may not challenge actions by NYCHA that comply with the TSAP as racially discriminatory. *Id.* However, the Consent Decree permits challenges to any amendments to the TSAP adopted or proposed by NYCHA during the five year period (¶ 6(b)).

**B. *The Working Family Preference***

In July 1995, NYCHA proposed to change the TSAP by adopting the WFP. The essential difference between the original TSAP and the WFP is the WFP's elimination of the "applicant's need for housing" as a priority. Instead, the WFP gives preference to families based on income. Thus, under the original TSAP, priority was afforded to families who needed housing the most. Under the WFP, in contrast, priority is afforded to families who can pay the most, regardless of their housing need.

In *Davis II,* this Court described the operation of the WFP as follows:

NYCHA would establish new local priorities as part of the applicant selection process. The highest local priority would be assigned to the highest income, Tier III applicants. The second priority is given to Tier II families. The lowest priority is given to Tier I families, but only to those who are working or are disabled. Tier I families receiving public assistance would receive no local priority. In addition, the proposed TSAP would categorize federal preference holders as working (including the dis-

abled) or "non-working." The federal preference holders who are working or disabled would receive a priority over those who are not. NYCHA also proposes to increase to 50% the proportion of new rentals to local preference holders and to reduce the proportion of rentals to federal preference holders to 50%

*Davis II,* 1997 WL 407250, at *4.

As set forth in *Davis II,* 1997 WL 407250 at *14, local preferences favoring working families are permitted, *see* 24 C.F.R. § 960.205(a) (1995), and such preferences do not require approval by the Department of Housing and Urban Development ("HUD"). The Davis Plaintiffs concede the proposed objectives of the WFP, namely, income integration in public housing and increasing the number of working families in public housing, are legitimate, but contend that the NYCHA has not sustained its burden of demonstrating that there is no less discriminatory means of advancing the same interests. Plaintiffs proposed an alternative method of increasing the representation of upper income families that would have a less racially discriminatory effect than the proposed WFP, a method which NYCHA has rejected.

**C. *The Effect of the Working Family Preference***

According to NYCHA's computer tapes, 5,885 families moved into NYCHA apartments during 1995. The racial breakdown of those families, along with the racial breakdown that would have occurred if the WFP had been in effect during that year, are summarized in the following table:

**Table 1**

**Race Distribution of 1995 Rentals Under Original TSAP and WFP**

| | White | African–American | Puerto Rican | Other Hispanic | Other | Total |
|---|---|---|---|---|---|---|

plications for conventional public housing efficiently and in accordance with the laws." TSAP, § I at 1.

| Original | | | | | | |
|---|---|---|---|---|---|---|
| TSAP | 250 | 2703 | 1768 | 860 | 340 | 5885 |
| WFP | 580 | 2594 | 1339 | 835 | 537 | 5885 |
| Difference | 330 | − 109 | − 429 | − 25 | 233 | 0 |

For future projections, Dr. Cupingood assumed that families of each race will make decisions about which projects to choose in the same manner, and with the same probabilities, as families of that race have done in the past.

NYCHA records move-outs and move-ins by race for each project in a report entitled, "Tenant Statistics by Race." NYCHA's expert, Dr. Peterson, annexed such reports as Exhibit E to his January 7, 1999 affidavit. Dr. Cupingood relied on these reports in his original affidavit and in this report in calculating expected move-out and move-in rates.

To calculate the probable number of white move-outs at each Disproportionate Project, Dr. Cupingood began by selecting a period for historical reference. Since Davis claimants began moving into Affected Developments in August 1995, the last year that is free of distortion by Davis move-ins is 1994. Additionally, since the bulk of NYCHA's discriminatory practices ended in 1990, the first year that is free of distortion caused by NYCHA's own discrimination was 1991. Thus, Dr. Cupingood selected the years 1991 through 1994 as a period for historical reference.

For each Disproportionate Project, Dr. Cupingood then calculated move-out rates based on NYCHA's Tenant Statistics by Race for the period 1991 through 1994. For example, if the population of a project at the beginning of 1991 was 100, and if 5 families moved out during 1991, then the

move-out rate for 1991 at that project was 5 percent (Cupingood Report, ¶ 8). Based on calculations like these for each Disproportionate Project for each year from 1991 to 1994, Dr. Cupingood determined the average move-out rate for each project. As a further refinement, Dr. Cupingood also calculated race-specific move-out rates for each Disproportionate Project (*Id.*). He then determined the probable number of white move-outs at each project in a given year by applying the appropriate turnover percentage to the population at the end of the year. (Cupingood Report, ¶ 9).

Using the historical period 1991–1994, Dr. Cupingood determined the total number of move-ins of each race into each project. He then determined the percentage of the total for white and non-whites who moved into each Disproportionate Project.[6] For example, there were 1,775 white move-ins during the four year period, 67 of whom moved into New Lane. The relative likelihood of a white family selection New Lane was therefore 67 divided by 1775, or 3.78% (Cupingood Report; ¶ 10 & Table 3).

Among all non-white move-ins from 1991 to 1994, 8.35 percent moved into one of the Disproportionate Projects.

### Table 2

### Clustering by White Families in Disproportionate Projects

---

**6.** Three Disproportionate Projects in the Williamsburg area of Brooklyn required special consideration during this analysis. On April 17, 1991, NYCHA settled a contempt motion with the plaintiffs in *Williamsburg Fair Housing Comm. v. New York City Housing Auth.*, 76 Civ. 2125 (S.D.N.Y.). As part of that settlement, NYCHA agreed to provide relief to identified victims of racial quotas that NYCHA enforced at the Independence, Williams, and Taylor Wythe projects between 1980 and February 1988. During the 1992–94 time period, over a third of all apartments rented at the three Williamsburg area projects were to victims of discrimination who moved in pursuant to that settlement. All victims in the *Williamsburg* case were families of color. In calculating move-in rates at these projects for the 1991–94 time period, Dr. Cupingood excluded move-ins that were made pursuant to the *Williamsburg* settlement. (*See* Cupingood Report, ¶ 11).

| Project Name | White | Non–White |
|---|---|---|
| Bay View | 2.14% | 1.18% |
| Berry | 1.92% | 0.03% |
| Cassidy–Lafayette | 3.78% | 0.19% |
| Forest Hills | 0.73% | 0.16% |
| Glenwood | 0.56% | 0.85% |
| Haber | 1.86% | 0.27% |
| Holmes Towers | 0.90% | 0.44% |
| Independence | 0.17% | 0.08% |
| Isaacs | 1.30% | 0.33% |
| Middletown Plaza | 1.92% | 0.14% |
| New Lane | 3.78% | 0.10% |
| Nostrand | 2.48% | 0.87% |
| Pelham Parkway | 1.13% | 0.90% |
| Pomonok | 3.89% | 1.14% |
| Robbins Plaza | 1.69% | 0.12% |
| Sheepshead Bay | 1.92% | 0.85% |
| South Beach | 1.80% | 0.23% |
| Straus | 0.68% | 0.10% |
| Taylor–Wythe | 0.11% | 0.07% |
| Todt Hill | 1.35% | 0.25% |
| Williams | 0.11% | 0.10% |
| **Total** | **34.19%** | **8.38%** |

Dr. Cupingood applied these figures to determine the probable impact on the WFP on move-in and move-out rates at each Disproportionate Project. He began by assuming that the WFP would have the racial impact calculated in his original November 14, 1996 affidavit, and adopted by this Court in its findings in *Davis II*. That is, he assumed that white admissions would comprise 9.9 percent of all admissions; African–Americans 44.1 percent; and so forth. *See Davis II*, 1997 WL 407250, at *4 (Cupingood Report, ¶ 12).

Next, using the historical move-in and move-out rates described above, he calculated the number of white move-ins and move-outs that would occur at each Disproportionate Project with the WFP operating. He performed these calculations for each of the next five years, and each of the next ten years. Each calculation was performed using two alternative assumptions. The first assumption posits that move-out probabilities for each race at each project will follow historical trends for that particular race and project. The second assumption which Dr. Cupingood employed in preparing his original affidavit posits that move-out probabilities for each race at each project will track overall historical turnover rates for that project. Dr. Cupingood then repeated these calculations on the assumption that the WFP was not operating. Again, these calculations were performed for the next five and ten years. Based on these figures, Dr. Cupingood quantified the impact the WFP would have on desegregation at each of the 21 Disproportionate Projects. He did so both in terms of the number of white families affected, and the percentage of white families affected. A summary of changes in the white population at each Disproportionate Project appears below in Table 3.

Table 3
**Effect of WFP at Disproportionate Projects**
**After Five Years**
**Assuming Historical turnover by Race**

| Project Name | Total Apts | Initial White | Five Years After Davis Move–Ins Original TSAP | WFP |
|---|---|---|---|---|
| Bay View | 1491 | 514 | 341 | 368 |
| Berry | 502 | 282 | 226 | 253 |
| Cassidy–Lafayette | 349 | 187 | 148 | 176 |
| Forest Hills | 383 | 198 | 158 | 170 |
| Glenwood | 1172 | 352 | 212 | 222 |
| Haber | 364 | 193 | 144 | 169 |
| Holmes Towers | 527 | 140 | 98 | 115 |
| Independence | 715 | 493 | 457 | 463 |
| Isaacs | 634 | 210 | 157 | 177 |
| Middletown Plaza | 168 | 87 | 83 | 101 |

| Project Name | Total Apts | Initial White | Five Years After Davis Move–Ins Original TSAP | WFP |
|---|---|---|---|---|
| New Lane | 270 | 197 | 175 | 192 |
| Nostrand | 1118 | 469 | 335 | 368 |
| Pelham Parkway | 1240 | 394 | 274 | 292 |
| Pomonok | 2047 | 850 | 682 | 748 |
| Robbins Plaza | 148 | 79 | 63 | 77 |
| Sheepshead Bay | 1032 | 363 | 248 | 277 |
| South Beach | 416 | 221 | 173 | 198 |
| Straus | 263 | 65 | 48 | 55 |
| Taylor–Wythe | 520 | 283 | 266 | 271 |
| Todt Hill | 501 | 234 | 179 | 199 |
| Williams | 565 | 348 | 326 | 329 |
| | | | | |
| Total | 14436 | 6099 | 4740 | 5172 |

Table 4
Relative Percentage Reduction in Number of White
Families due to WFP After Five years Assuming
Historical Turnover by Race

| Project Name | Reduction in White Families No WFP | WFP | Percentage |
|---|---|---|---|
| Bay View | 173 | 146 | 15.6% |
| Berry | 56 | 29 | 48.2% |
| Cassidy–Lafayette | 39 | 11 | 71.8% |
| Forest Hills | 40 | 28 | 30.0% |
| Glenwood | 140 | 130 | 7.1% |
| Haber | 49 | 24 | 51.0% |
| Holmes Towers | 42 | 25 | 40.5% |
| Independence | 36 | 30 | 16.7% |
| Isaacs | 53 | 33 | 37.7% |
| Middletown Plaza | 4 | − 14 | n/a |
| New Lane | 22 | 5 | 77.3% |
| Nostrand | 134 | 101 | 24.6% |
| Pelham Parkway | 120 | 102 | 15.0% |
| Pomonok | 168 | 102 | 39.3% |
| Robbins Plaza | 16 | 2 | 87.5% |
| Sheepshead Bay | 115 | 86 | 25.2% |
| South Beach | 48 | 23 | 52.1% |
| Straus | 17 | 10 | 41.2% |
| Taylor–Wythe | 17 | 12 | 29.4% |
| Todt Hill | 55 | 35 | 36.4% |
| Williams | 22 | 19 | 13.6% |
| | | | |
| Total | 1366 | 938 | |

As the table indicates, at most projects where the WFP would not cause actual increases in segregation, the impairment in desegregation is at least 25 percent (Cupingood Report, ¶ 15).

The impact on desegregation can also be seen in terms of the percentage of white families who would reside in each Disproportionate Project. Assuming historical turnover by race, after five years under

the WFP, the percentage of white families at Middletown Plaza would rise from 51.85 to 60.1% (instead of falling to 49.4%). At the remaining Disproportionate Projects, white occupancy percentages would either stabilize or fall more slowly under the WFP than under the original TSAP. For example, at Cassidy–Lafayette, after five years the percentage of white families in occupancy would inch down from 53.6% to 50.4% (instead of falling to 42.4%). Table 5 below summarizes the changes in white occupancy percentages caused by the WFP after five years (assuming historical turnover by race).

Table 5

**Change in Percentage White Occupancy At
Disproportionate Projects After Five Years
Assuming Historical Turnover by Race**

| | | Five Years after Davis Move–Ins | |
| | Initial | Original | |
| Project Name | % White | TSAP | WFP |
| --- | --- | --- | --- |
| Bay View | 34.5% | 22.9% | 24.7% |
| Berry | 56.2% | 45.0% | 50.4% |
| Cassidy–Lafayette | 53.6% | 42.4% | 50.4% |
| Forest Hills | 51.7% | 41.3% | 44.4% |
| Glenwood | 30.0% | 18.1% | 18.9% |
| Haber | 53.0% | 39.6% | 46.4% |
| Holmes Towers | 26.6% | 18.6% | 21.8% |
| Independence | 9.0% | 63.9% | 64.8% |
| Isaacs | 33.1% | 24.8% | 27.9% |
| Middletown Plaza | 51.8% | 49.4% | 60.1% |
| New Lane | 73.0% | 64.8% | 71.1% |
| Nostrand | 41.9% | 30.0% | 32.9% |
| Pelham Parkway | 31.8% | 22.1% | 23.5% |
| Pomonok | 41.5% | 33.3% | 36.5% |
| Robbins Plaza | 53.4% | 42.6% | 52.0% |
| Sheepshead Bay | 35.2% | 24.0% | 26.8% |
| South Beach | 53.1% | 41.6% | 47.6% |
| Straus | 28.5% | 27.4% | 20.9% |
| Taylor–Wythe | 54.4% | 51.0% | 52.1% |
| Todt Hill | 46.7% | 35.7% | 39.7% |
| Williams | 61.6% | 57.5% | 58.2% |

Similar trends exist after ten years, except that at Disproportionate Projects where desegregation would not essentially stop, the magnitude of the impact of the WFP would generally become larger. For example, at Middletown Plaza, where segregation would increase under the WFP, the white population would climb to 108 instead of falling to 81. At Berry Houses, where desegregation would be significantly slowed, the white population would fall to 231 instead of 186. In the aggregate, after ten years under the WFP (again assuming historical turnover by race), the Disproportionate Projects would be occupied by 722 more white families than would have resided in those projects in the absence of the WFP. (Cupingood Report, ¶ 16). Table 6 summarizes white occupancy figures after ten years of operation with and without the WFP.

Table 6

**Effect of WFP at Disproportionate Projects**

**After Ten Years**
**Assuming Historical Turnover by Race**

| Project Name | Total Apts | Initial White | Ten Years after Davis Move–Ins | |
| --- | --- | --- | --- | --- |
| | | | Original TSAP | WFP |
| Bay View | 1491 | 514 | 230 | 272 |
| Berry | 502 | 282 | 186 | 231 |
| Cassidy–Lafayette | 349 | 187 | 123 | 168 |
| Forest Hills | 383 | 198 | 128 | 148 |
| Glenwood | 1172 | 352 | 130 | 145 |
| Haber | 364 | 193 | 114 | 154 |
| Holmes Towers | 527 | 140 | 73 | 100 |
| Independence | 715 | 493 | 425 | 436 |
| Isaacs | 634 | 210 | 121 | 154 |
| Middletown Plaza | 168 | 87 | 81 | 108 |
| New Lane | 270 | 197 | 159 | 188 |
| Nostrand | 1118 | 469 | 245 | 298 |
| Pelham Parkway | 1240 | 394 | 193 | 222 |
| Pomonok | 2047 | 850 | 558 | 672 |
| Robbins Plaza | 148 | 79 | 54 | 76 |
| Sheepshead Bay | 1032 | 363 | 175 | 200 |
| South Beach | 416 | 221 | 141 | 183 |
| Straus | 263 | 65 | 36 | 47 |
| Taylor–Wythe | 520 | 283 | 250 | 259 |
| Todt Hill | 501 | 234 | 140 | 174 |
| Williams | 565 | 348 | 305 | 312 |
| | | | | |
| **Total** | **14436** | **6099** | **3819** | **4530** |

Table 7 below summarizes the impact of the WFP on the white population of the Disproportionate Projects, assuming that move-out patterns for each race at each project would reflect the overall historical move-out trend for that project. For all the Disproportionate Projects, the WFP would boost the white population after five years from 5,176 t 5,680—an increase of 504 white families. After ten years, the WFP would boost the white population at the 21 Disproportionate Projects from 4,433 to 5,288—an increase of 855 white families.

**Table 7**

**Effect of WFP at Disproportionate Projects**
**After Five Years**
**Assuming Historical Turnover by Race**

| Project Name | Total Apts | Initial White | Five Years after Davis Move–Ins | |
| --- | --- | --- | --- | --- |
| | | | Original TSAP | WFP |
| Bay View | 1491 | 517 | 401 | 440 |
| Berry | 502 | 283 | 244 | 274 |
| Cassidy–Lafayette | 349 | 187 | 177 | 209 |
| Forest Hills | 383 | 198 | 171 | 184 |
| Glenwood | 1172 | 356 | 252 | 267 |
| Haber | 364 | 193 | 153 | 179 |
| Holmes Towers | 527 | 144 | 109 | 127 |

| Project Name | Total Apts | Initial White | Five Years after Davis Move–Ins Original TSAP | WFP |
|---|---|---|---|---|
| Independence | 715 | 493 | 460 | 465 |
| Isaacs | 634 | 219 | 185 | 211 |
| Middletown Plaza | 168 | 87 | 75 | 93 |
| New Lane | 270 | 197 | 187 | 205 |
| Nostrand | 1118 | 471 | 367 | 409 |
| Pelham Parkway | 1240 | 403 | 310 | 333 |
| Pomonok | 2047 | 852 | 709 | 780 |
| Robbins Plaza | 148 | 78 | 69 | 83 |
| Sheepshead Bay | 1032 | 365 | 279 | 314 |
| South Beach | 416 | 221 | 185 | 212 |
| Straus | 263 | 65 | 48 | 55 |
| Taylor–Wythe | 520 | 283 | 257 | 261 |
| Todt Hill | 501 | 235 | 199 | 222 |
| Williams | 565 | 348 | 317 | 321 |
| **Total** | **14436** | **6099** | **4740** | **5172** |

## Discussion

### I. *The Issues*

As noted, the Second Circuit has held that the proper standard to be applied on remand is "whether the proposed working family preference will *significantly* perpetuate segregation at the relevant NYCHA developments." *Davis IV*, 166 F.3d at 438. NYCHA has urged that the remediation required by the Consent Decree has been achieved and that therefore there is no perpetuation of segregation which could result from the WFP and no discrimination remaining to be remediated under the Consent Decree. In addition, the Authority contends that if there is segregation extant under the Consent Decree the WFP does not significantly perpetuate it. The Davis Plaintiffs take the contrary view of the issues. The questions to be resolved therefore are:

1. Is there a basis upon which to conclude that there is segregation to be dealt with under the Consent Decree?

2. Does the WFP significantly perpetuate segregation?

7. There are now 20 Disproportionate Projects as in the past year, the Glenwood project fell below the 30 percent threshold. As such, this

### II. *There is Segregation to be Dealt with under the Consent Decree*

### A. *30 Percent Will Be Used as the Metric By Which Segregation Will Be Determined in this Case*

■ As an initial matter, the parties disagree as to the appropriate measure for assessing whether segregation exists. As noted, throughout this litigation projects have been deemed "disproportionate" or "predominantly white" if more than 30 percent of the parties residing there are white.[7] *See, e.g., Davis II*, 1997 WL 407250 at \*12. The Authority contends that there is nothing in the Consent Decree that supports the inference that if a project is 30 percent white it is disproportionate or segregated.

The sole reference to the 30 percent figure is contained in the TSAP, incorporated by reference in the Consent Decree. Section VIII(A) of the TSAP, entitled the "Project Outreach Plan," states in relevant part that: "if the OCD [Occupancy Control Division] determines that borrowing applications from a nearby project is likely to solve the project's need for applications, it shall select the nearest project that has a

Court's injunction no longer applies to Glenwood.

sufficient number of applications for that size apartment. However, if the borrowing project's tenant body is more than 30% white, OCD shall not select a project whose tenant body is also more than 30% white." (TSAP at 29, hereinafter the "Borrowing Provision").[8]

The 30 percent figure set forth in the Borrowing Provision is not, as NYCHA urges, an arbitrary number, but a negotiated figure that implies that the parties and the Court believed that a project was disproportionately white if more than 30 percent of its families are white. *See Armour & Co.*, 402 U.S. at 681, 91 S.Ct. 1752 ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms"). An examination of Exhibit A to the Consent Decree, a list of projects where it was alleged that discriminatory practices occurred in statistically significant amounts, reveals that during the time in question most of these projects were at least 30 percent white. Plaintiffs aver that the parties adopted the 30 percent figure because "it described in a simple manner that could easily be implemented in the TSAP which projects had been ... affected by past segregation." (Tr. of June 18, 1999 Hearing at 59).

■ The TSAP must be read as in harmony with existing law. *See, e.g., Prate v. Freedman*, 583 F.2d 42 (2d Cir.1978) (before a consent decree can be approved, the court must assure itself that the terms of the decree are not unlawful, unreasonable, or inequitable). Under existing law, borrowing of applications could not have been prohibited at projects more than 30 percent white (without regard for claimant relief) unless those projects were still tainted by past segregation. As will be discussed more fully below, remedies containing race-conscious relief "must be substantially related to the objective of eliminating the alleged instance of discrimination, ... and must not unnecessarily trammel the interests of affected third parties." *Kirkland v. New York State Dept. of Correctional Serv.*, 711 F.2d 1117, 1132 (2d Cir.1983). Thus, had there been no finding that housing projects that are greater than 30 percent white were affected by past segregation, the Borrowing Provision would be unlawful.

This Court has held that "[u]nder the TSAP, a project is considered disproportionately white if more than 30 percent of its families are white." *See Davis II*, 1997 WL 407250 at *12.[9] This finding was not disturbed by the Second Circuit on appeal. Accordingly, 30 percent will continue to be employed as a measure to identify segregation in this case.

**B. *The Consent Decree Extends Beyond Remediation of Davis' Victims***

■ It is the position of the Authority that the Court may no longer consider whether the Disproportionate Projects remain segregated once NYCHA has fully complied with its court-ordered obligations to render remedial relief to the specific victims of its prior discriminatory practices. Specifically, NYCHA urges that "Once remedial relief has been provided under the *Davis* consent decree the Developments can no longer be considered segregated and the WFP cannot, as a matter of law, be said to perpetuate segregation there." (Letter to the Court, dated May 10, 1999, from Henry Schoenfeld, Esq. at 1).

---

8. The revised TSAP of December 15, 1997 contains an identical provision except that OCD is now referred to as the Field Liaison Division (FLD).

9. This does not mean, as NYCHA posits, that the TSAP imposes a "quota" or requires that any particular project achieve any specific level of desegregation. Rather, the TSAP identifies housing projects that are 30 percent white as infected by past segregation. Thus, with regard to these identified projects, changes to the TSAP that significantly perpetuate segregation violate the Fair Housing Act.

The Authority made this precise argument to the Court of Appeals in this case, and the Second Circuit declined to adopt it. *See Davis IV,* 166 F.3d 432.[10] As a factual matter, an examination of NYCHA's own statistics reveals that victim relief in this case will not desegregate the Affected Developments.[11] As the following table demonstrates, even after claimant relief is completed, every Affected Development will still have white populations significantly greater than the prevalence of whites in the relevant applicant pool.

### Table # 8

| Project Name | Total Apts | June 1998 # White | June 1998 % White | After Davis Relief # White | After Davis Relief % White | % White In App. Pool |
|---|---|---|---|---|---|---|
| Bay View | 1491 | 520 | 34.9% | 514 | 34.5% | 4.3% |
| Berry | 502 | 286 | 57.0% | 282 | 56.2% | 6.9% |
| Cassidy–Lafayette | 349 | 187 | 53.6% | 187 | 53.6% | 35.8% |
| Forest Hills | 383 | 200 | 50.9% | 198 | 51.7% | 23.1% |
| Glenwood | 1172 | 362 | 30.9% | 352 | 30.0% | 4.3% |
| Holmes Towers | 527 | 161 | 30.6% | 140 | 26.6% | 5.2% |
| Isaacs | 634 | 234 | 36.9% | ·210 | 33.1% | 5.2% |
| Middletown Plaza | 168 | 87 | 51.5% | 87 | 51.8% | 1.9% |
| New Lane | 270 | 197 | 73.0% | 197 | 73.0% | 35.8% |
| Nostrand | 1118 | 474 | 42.4% | 469 | 41.9% | 4.3% |
| Pelham Parkway | 1240 | 420 | 33.9% | 394 | 31.8% | 1.7% |
| Pomonok | 2047 | 869 | 42.5% | 850 | 41.5% | 3.4% |
| Robbins Plaza | 148 | 79 | 53.4% | 79 | 53.4% | 5.2% |
| Sheepshead Bay | 1032 | 368 | 35.7% | 363 | 35.2% | 4.3% |
| South Beach | 416 | 223 | 53.6% | 221 | 53.1% | 6.9% |
| Straus | 263 | 80 | 30.4% | 65 | 24.7% | 5.2% |
| Todt Hill | 501 | 238 | 47.5% | 234 | 46.7% | 6.9% |

As the table indicates, virtually all of the Affected Developments will remain at least 30 percent white even after relief for *Davis* claimants ends. Thus, these projects are not desegregated merely because the process of locating and offering apartments to past victims of discrimination will soon end.

Significantly, the Authority's interpretation is inconsistent with the record upon which the Consent Decree is based. At the time the Consent Decree was entered in 1992, the NYCHA "admitted to race-conscious admissions practices that led to 'racial steering' of white applicants to predominantly white housing projects. Move-in, move-out data also demonstrated a consistent pattern of white families being replaced by other white families over time, a pattern the United States, in its memorandum in support of the Decree concluded 'could only occur as a result of a deliberate racial quota system.' " *Davis II,* 1997 WL 407250 at *10. The Authority has admitted that its discriminatory practices began as early as 1960, (*see* NYCHA Mem. In Support of Fairness and Adequacy of Consent Decree, at 21 (Oct. 30, 1992)), and the Honorable Pierre N. Leval found that these practices persisted and resulted in segregation in New York City public housing as late as 1991. *See Davis v. New York City Housing Authority,* 1992 WL 420923, *2 (S.D.N.Y. December 31, 1992).[12]

10. In the Authority's brief to the Second Circuit, four pages were devoted to this argument. Page 16 of the Authority's brief reads, "[o]nce the remedial relief under the consent decree is fully implemented, the working family preference cannot, as a matter of law, perpetuate segregation."

11. *See* NYCHA Tenant Statistics By Race, June 30, 1998.

12. Judge Leval found that:

Plaintiffs' evidence supports their allegations that during specified periods of time the Housing Authority selected and as-

Under the Consent Decree, however, NYCHA has been required to extend relief only to plaintiff class members who were victims of discriminatory practices between 1985 and 1990. *See* Consent Decree at it ¶¶ 1(g) & (*l*), 10–39. Because the victim relief afforded by the Consent Decree is limited to a subset of the years in which NYCHA practiced racial steering, the Consent Decree's remedial relief provisions only go part of the way toward effectuating desegregation.

NYCHA's position is also belied by the text and structure of the Consent Decree. As the Supreme Court has stated, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). The Consent Decree is not limited to the relief to be provided to the *Davis* class members. It also includes extensive injunctive relief designed to address the past discriminatory actions of the NYCHA and to ensure the achievement of a nondiscriminatory system and the elimination of segregation.

For example, NYCHA is "permanently enjoined from ... adopting and implementing any tenant application, selection, assignment, and transfer plan, or any such policy or process, which gives preference to Applicants or tenants on the basis of race, color, or national origin." Consent Decree, ¶ 4(a). Other permanent injunctive provisions bar NYCHA from refusing to make rentals or transfers on the basis of race (¶ 4(b)); making statements indicating a preference or limitation based on race (¶ 4(c)); representing on account of race that apartments are not anticipating vacancies when they are, in fact, anticipating vacancies (¶ 4(d)); and a number of other limitations.

These injunctions apply not just to the Affected Developments as defined in ¶ 1(b)—and indeed, not just to "Conventional Public Housing" as defined in ¶ 1(h)—but to all of NYCHA's housing, "conventional or otherwise" (¶ 4), by requiring NYCHA to operate a race-neutral tenant-selection system at all of its housing projects.

Under the Consent Decree, these permanent injunctive provisions may not be construed to bar remedial relief to others who do not receive relief under the Consent Decree. Paragraph 4(j) of the Consent Decree provides:

> Nothing in this paragraph shall be deemed to prohibit the provision of remedial relief under this Consent Decree or remedial relief to any identified victims of past discrimination on the basis of race, color or national origin who do not receive relief under this Consent Decree.

Consent Decree, ¶ 4(j).

In addition to the injunctive decrees in ¶ 4, NYCHA is also enjoined to adopt a TSAP and implement it "to prevent any unlawful discrimination on the basis of race, color, or national origin, in compliance with the Housing Authority's obligations therewith under Title VI, the Fair Housing Act and the implementing regulations and requirements of HUD." (¶ 5). In implementing the TSAP, NYCHA is barred from using racial quota systems

signed applicants for public housing, and tenants requesting transfers, to certain housing projects using methods that resulted in unlawful discrimination against Blacks and Hispanics. These methods included (1) the intermittent use of codes denoting housing projects to which only white families could be assigned; (2) the use of zip code and other geographic restrictions on admission to projects; (3) the use of racial goals or targets when new projects were "rented up" and on an ongoing basis thereafter; and (4) the assignment of families to projects where vacancies were not expected to arise. The evidence submitted by plaintiffs also supports their allegations that one or more of these practices continued during the period addressed in the Consent Decree (1983 through 1990, and on Staten Island through May 1991). *Davis v. New York City Housing Authority*, 1992 WL 420923 at *2.

(¶ 7(a)) and neighborhood preferences (¶ 7(b)). NYCHA is also enjoined from referring applicants out of turn to particular projects because of race (¶ 7(c)). Where a dispute arises concerning whether a change by NYCHA to the TSAP violates these provisions, as happened here, NYCHA is permitted, pending resolution by this Court, to:

> implement the proposed modification at its own risk, but without prejudice to the right of the plaintiffs to move the court to enjoin the proposed modification as inconsistent with the terms of this Consent Decree, and to seek full and complete relief for persons harmed by the changes, and any other appropriate relief authorized by the Fair Housing Act.

Consent Decree, ¶ 6(b). This language permits plaintiffs to seek relief for persons other than and in addition to those who may have been claimants affected by NYCHA's past discrimination.

Unlike other portions of the Consent Decree, which "sunset" after a period of time, the permanent injunctive portions of the Decree have no sunset date. Paragraph 50 of the Consent Decree provides:

> With the exception of the permanent injunctive provisions, this Consent Decree shall be dissolved eight years and six months after the date of entry.

Therefore, as these provisions make clear, changes to the TSAP that violate Title VI and the Fair Housing Act may be enjoined, and the Court may order any other relief authorized by those statutes, even after victim-relief at the Affected Developments expires. Paragraph 4(j) of the Consent Decree states that the permanent injunctions may not be construed so as to bar relief for persons "who do not receive relief under this Consent Decree."

The permanent injunctions in ¶ 4 apply not just to the 31 Affected Developments listed in Exhibit A to the Consent Decree—and, as noted, not just to "Conventional Public Housing" as defined in ¶ 1(h)—but to all NYCHA housing, "con-ventional or otherwise." If NYCHA were correct that TSAP changes causing increases in segregation are not actionable after victim-relief at the Affected Developments ends, then the extension of the injunction beyond the Affected Developments to all NYCHA housing, "conventional or otherwise," would be meaningless.

Paragraph 6(b) of the Consent Decree authorizes the plaintiffs to seek "full and complete relief" for persons harmed by changes to the TSAP that violate the Fair Housing Act. If the Court could not find that increases in segregation caused by changes to the TSAP' violate the Fair Housing Act after victim-relief ends, as NYCHA claims, then ¶ 6(b) would be extraneous, since the Court could not order full and complete relief once victim-relief ended. The completion of victim-relief at some Affected Developments has no bearing on whether a TSAP change that increases segregation in NYCHA's projects are actionable under the Consent Decree.

■ NYCHA attempts to conflate relief for identified victims of discrimination with relief designed to effect desegregation. However, victim relief and relief intended to eradicate segregation stand on different footings. A preference based on race to identified victims of discrimination is always a permissible equitable remedy. As the Ninth Circuit has stated, "when ... a state gives the identified victims of state discrimination jobs or contracts that were wrongly denied them, the beneficiaries are not granted a preference 'on the basis of their race' but on the basis that they have been individually wronged." *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 700 n. 7 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 526, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (Scalia, J. concurring) ("Nothing prevents Richmond from according a contracting preference to identified· victims of discrimination. While most of the beneficiaries might be black,

neither the beneficiaries nor those disadvantaged by the preference would be identified on the basis of their race.").

■ By contrast, race-conscious relief designed to eradicate the effects of past segregation is permissible under both Title VII,[13] *see Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 516, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and the Fourteenth Amendment, *see Wygant v. Jackson Bd. Of Educ.,* 476 U.S. 267, 287, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring), even if the relief benefits a class that includes non-victims, so long as it is narrowly tailored to serve a compelling state interest. *See Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *United States v. Yonkers Board of Educ.,* 837 F.2d 1181, 1236 (2d Cir.1987). The predicate for this type of relief is that past segregation actually affected the class of persons to whom the relief runs, even if the class includes persons who are not themselves victims of discrimination. *See e.g., Local No. 93,* 478 U.S. at 516, 106 S.Ct. 3063 ("It is equally clear that the voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination.") (*citing Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)).

The Consent Decree in this case incorporates both forms of relief. The injunctive provisions of ¶¶ 4–8 are intended to eradicate the effects of past segregation at NYCHA's projects, "conventional or otherwise." The beneficiaries of the permanent injunctions include both victims and non-victims of discrimination. The victim-specific relief provisions, in contrast, are intended to afford relief to actual victims of discrimination at 31 designated Affected Developments.

Given that the Consent Decree adopted a comprehensive package of remedies designed to correct segregation that occurred over decades, it is premature to assume that segregation has been eliminated by compliance with one aspect of the Decree. *See Board of Education v. Dowell,* 498 U.S. 237, 249–50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (in the school desegregation setting, a court should consider whether the system has complied in good faith with the decree, and whether, looking at every facet of school operations, the vestiges of past discrimination have been eliminated to the extent practicable). There are grounds, therefore, to consider the position of the Davis Plaintiffs that the WFP significantly perpetuates segregation.

### III. *The WFP Will Significantly Perpetuate Segregation at the Affected Projects*

■ An action that perpetuates existing patterns of segregation violates the Fair Housing Act. *See Huntington,* 844 F.2d at 937 (*citing Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (1989)). The determinative issue here is whether the proposed WFP will "*significantly* perpetuate segregation at the relevant NYCHA developments." *Davis IV,* 166 F.3d at 438. While the parties disagree somewhat on the methodology employed and the accuracy of the statistics presented by the experts, the real quarrels in this action are legal. Specifically, the NYCHA asserts that even accepting *arguendo* Dr. Cupingood's figures, the projected effect of the WFP is *de minimis.* Plaintiffs counter that the WFP would "severely impair" desegregation at the 21 Disproportionate Projects, and that the impact would be "significant"

---

**13.** Title VII and Title VII "are part of a coordinated scheme of federal civil rights laws enacted to end discrimination; the Supreme Court has held that both statutes must be construed expansively to implement that goal." *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d. Cir.) (noting relevance of Title VII case law to Title VIII cases), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988).

whether measured in absolute numbers or by standard statistical tests.

## A. *The Appropriate Comparison Group*

■ As this Court has stated, "[a]lthough discriminatory effect is generally shown by statistical evidence, any statistical analysis must involve the appropriate comparables." *Davis II*, 1997 WL 407250 at *6 (*quoting Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1253 (10th Cir.1995)). NYCHA submits that Plaintiffs err in comparing (1) the projected percentage of white families at the Disproportionate Projects if the original TSAP, which does not have a WFP, were employed for the next ten years with (2) the projected percentage of white families at the at the Disproportionate Projects employing the WFP under the current TSAP over the same period. NYCHA notes that in rejecting Plaintiffs' claims that the WFP would have a disparate impact on minorities, this Court found it inappropriate to compare projected results under the old and new TSAP systems and that the proper comparables are the racial composition of the qualified applicant pool with the projected effects of the WFP. *See Davis II*, 1997 WL 407250 at *6–10. Thus, NYCHA concludes that the correct standard against which the projected effect of the WFP should be measured is the racial composition of the actual tenant population at each of the projects.

NYCHA's position, however, is contrary to Supreme Court precedent. Where a court-ordered plan intended to eradicate past segregation is in effect, and where, as here, a proposed change to the plan is alleged to perpetuate past segregation, the Supreme Court has compared the results under the proposed plan with those under the original, court-ordered plan.[14]

Several school-desegregation cases are illustrative. In *Wright v. Council of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), for example, the district court ordered Greensville County, Virginia to implement a desegregation plan. After the district court issued its order, the City of Emporia, located within Greensville County, implemented plans to operate a separate school system, and parents in Greensville County were invited to send their children to the Emporia schools. In affirming the district court's injunction barring the change because it would impede or delay desegregation, the Supreme Court compared what would have been obtained under the court-ordered plan to the new plan. *See* 407 U.S. at 457–58, 92 S.Ct. 2196 (comparing statistics contemplated by the desegregation decree with those contemplated by the change).

Similarly, in *United States v. Scotland Neck City Board of Educ.*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972), the county of Halifax, North Carolina reached an agreement with the United States regarding a so-called "Interim Plan" to eradicate past segregation. After the Interim Plan had been submitted to the school board, but before a vote could be taken, the North Carolina Legislature enacted a bill permitting the City of Scotland Neck to establish a separate school system. Sustaining the district court's preliminary injunction against the change because it would impede desegregation, the Supreme Court compared projected enrollments under the Interim Plan with those under the challenged plan. *See* 407 U.S. at 489–90, 92 S.Ct. 2214 (comparing enrollment under

---

**14.** Conventionally, the *adverse impact* of an applicant selection process in housing and employment cases is determined by whether minority applicants are chosen at a rate lower than their proportional representation in the overall applicant pool. *See, e.g., United States v. Starrett City Assocs.*, 840 F.2d 1096, 1099 (2d Cir.1988). The query here, however, is not whether the WFP would have an adverse impact on minority applicants, but whether it will significantly perpetuate segregation. Accordingly, a different basis of comparison is employed.

Interim Plan with that under challenged plan).

Accordingly, in evaluating whether the WFP significantly perpetuates segregation, the relevant comparison will be the desegregation that would be achieved under the original TSAP with the projected effect of the WFP.

### B. *White Decline Under the WFP*

NYCHA contends that so long as the white occupancy rates would decline under the WFP, regardless of the rate of decline, then the WFP cannot be said to perpetuate segregation. (*See* Peterson Third Aff. ¶¶ 7 and 23(a)). Plaintiffs assert that this position makes "little sense" and offer the following example:

> Assume hypothetically that the current racial composition of Project X is 50 percent white and that all projects more than 30 percent white reflect the vestiges of past segregation. Also assume that without the WFP, the percent [of] white[s] at Project X will decline by 4 percent per year, and would thus reach 30 percent white in five years. Finally, assume that under the WFP, the percent white would decline by only 1 percent per year and would thus reach 30 percent white in 20 years. Dr. Peterson would claim that the WFP did not perpetuate segregation because the percent white at Project X would still decline under the WFP, no matter how slowly.

He would dismiss as irrelevant the fact that the vestiges of segregation would persist for an additional 15 years. But "perpetuate" means to extend in time. (Cupingood Fourth Aff. ¶ 8).

The relevant inquiry here is not whether desegregation will occur *eventually*, but whether the WFP will significantly delay desegregation at the Disproportionate Projects. *See Monroe v. Board of Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968) ("if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable."); *Wright*, 407 U.S. at 460, 92 S.Ct. 2196 ("if the proposal would impede the dismantling of the dual system, then the district court ... may enjoin it from being carried out").[15]

As noted, this Court has adopted Dr. Cupingood's conclusion that:

> assuming that existing turnover and move-in rates persist and that for each vacancy set aside for claimants under the *Davis* decree, a family of color would replace a white family, implementation of the Working Family Preference would effectively "freeze" the desegregation process at the racially identifiable projects, in violation of Title VIII..... The Working Family Preference will have this effect because it will more than double white admission rates [16] and be-

---

**15.** Many courts have enjoined practices that impede or delay segregation. Injunctions against these practices frequently arise in employment discrimination cases where the challenged practice impedes hiring or promotions necessary to effectuate integration of the workforce. *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914 (6th Cir.1979) is illustrative. In *Sarabia*, a consent decree had been adopted "to erase any vestiges of past employment discrimination" in the Toledo police force. 601 F.2d at 915. After three and one-half years of operation under the decree, the percentage of African–Americans on the police force increased from 7 percent to only 8.4 percent, although the population of Toledo was approximately 14 percent African–American. The plaintiffs charged that a civil service hiring rule, the so-called "rule of

three," was impeding desegregation of the police force. Concluding that the hiring rule delayed the elimination of the vestiges of past employment discrimination, the Sixth Circuit sustained the district court's order suspending the civil service rule. *Id.* at 619. Notably, it was no defense that the percentage of whites on the force was slowly declining even with the challenged rule in place. *See also Glass City Black Brothers United v. Neeb*, 540 F.Supp. 852 (N.D.Ohio 1982); *cf. Arthur v. Nyquist*, 712 F.2d 816 (2d Cir.1983).

**16.** In his affidavit dated June 22, 1999, Defendants' expert asserts that if the Court's injunction had not been in place during 1998, the number of whites admitted to NYCHA's public housing would have climbed "only to

cause existing trends demonstrate that many of these additional white families will be concentrated in predominantly white developments. *Davis II*, 1997 WL 407250 at *12.

### C. *The Impact of the WFP on Desegregation is Statistically and Legally Significant*

■ "Statistical significance" measures whether a particular phenomenon is the cause of a specific set of effects. *See Ottaviani v. State Univ. at New Paltz*, 875 F.2d 365, 371 (2d Cir.1989). "Legal significance," by contrast, measures whether, assuming the phenomenon was the cause of those effects, those effects have any legal import. *See Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1511 n. 4 (10th Cir. 1987).

#### 1. *Statistical Significance*

After performing a rigorous statistical analysis,[17] detailed above, Dr. Cupingood concluded that the reduction in desegregation caused by the WFP would be statistically significant at every disproportionate project.

A standard tool for assessing statistical significance is the two-standard deviation test. The test is used to determine whether a deviation from the expected norm is small enough to be attributable to chance, or so large that random chance could not reasonably account for the outcome. "The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results." *Ottaviani*, 875 F.2d at 371.[18] Courts have frequently adopted a standard of two to three standard deviations as constituting statistical significance. *See Hazelwood School District v. United States*, 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("if the difference between the expected value and observed number is greater than two or three standard deviations, then the hypothesis that employees were hired without regard to race would be suspect."); *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

In this case, the measured values are the differences between the white move-ins at the Disproportionate Projects with and without the WFP for various time periods (five and ten years). Dr. Cupingood's report indicates those differentials, both in magnitude and in terms of standard deviation units, for the five-year and ten-year time periods. For the five year-period, and assuming historical turnover trends for each race, the WFP would re-

---

6.48%" [from 4.2 percent] rather than 9.9 percent as Dr. Cupingood originally predicted. However, in addition to a number of other errors, Dr. Peterson did not account for the fact that several thousand families who moved into NYCHA housing during 1998 were selected for interviews and/or certified to project waiting lists before the WFP went into operation. Because families selected under the old TSAP are still working their way through the "pipeline," the white admission rate in 1998 was significantly lower than would have occurred if all families had been selected for interviews and certified pursuant to the WFP. Moreover, Dr. Petersons' conclusion is based on an under-representation of 1998 move-ins. Significantly, even accepting Dr. Peterson's methodology, and adjusting only for the undercount of families to the 21 projects, one obtains a corrected figure of 8.53 percent white among families who were placed in 1998 and were "allegedly untainted by the Pipeline Effect" (Cupingood Sixth Aff. ¶ 9).

17. Defendants suggest that Dr. Cupingood's projections are unreliable in that his calculations are subject to uncertainties involving certain variables such as turnover rates, applicant pool composition, and project selection probabilities. While projections about the future, are by definition, subject to some uncertainty, Dr. Cupingood has taken reasonable steps, such as the use of historical averages, to minimize the impact of possible uncertainties.

18. For example, a disparity of two standard deviations corresponds to a five-percent probability that the observed outcome is random, while a disparity of three standard deviations corresponds to a 0.3 percent probability that the observed outcome could be attributable to chance.

sult in a total of approximately 1,139 white move-ins at the Disproportionate Projects, as compared to only 625 without the WFP. The difference between these figures— some 514 excess white move-ins—represents 15.39 standard deviation units and is highly significant.[19]

Statistical significance can also be analyzed at the project level. Dr. Cupingood's report shows that after five years, 18 of the 21 Disproportionate Projects would have statistically significant white move-in differential caused by the WFP. At the ten year mark, again using historical turnover rates for each race, 20 of the 21 Disproportionate Projects would have statistically significant reductions in desegregation. At Holmes Towers, for example, the WFP would result in approximately 75 white move-ins as opposed to 34 without the WFP, a disparity representing 4.3 standard deviation units. At Pomonok, there would be approximately 287 white move-ins with the WFP and 138 without the WFP in place, a difference constituting 8.21 standard deviation units. (See Cupingood Fourth Aff. Table 12).

Defendants claim that "it is apparent that the number of whites had already fallen below Dr. Cupingood's projected post-Davis numbers at 14 out of the 21 projects," (Peterson Third Aff. ¶ 19), and assert that Plaintiffs have overestimated white population declines under the WFP. However, this contention is erroneous. When Dr. Cupingood prepared his report, the most recently available Tenant Statistics by Race report was for June 30, 1998. (See Cupingood Third Aff. ¶ 7). At each Disproportionate Project that was also a Davis Affected Development, Dr. Cupingood adjusted the number of whites indicated on the June 30, 1998 report downward to reflect all future Davis claimant move-ins. (See id. ¶¶ 7–8). Dr. Peterson compared those adjustments to the actual changes in the white population caused by

post-June 30 activity. (See Peterson Third Aff. ¶¶ 15–17). Thus, Dr. Peterson compared two completely unrelated figures: (1) the adjustment to account for housing of all future Davis claimants prior to any post-June 30, 1998 activity; and (2) the figure for actual changes in the white population caused by post-June 30 activity, but prior to housing all Davis claimants. This comparison is meaningless.

Accordingly, the reduction in desegregation caused by the WFP is statistically significant.

### 2. Legal Significance

While statistical significance is necessary to establish legal significance, it is not sufficient. It must thus be determined whether the statistically significant difference occasioned by the WFP is of ample magnitude to be of practical importance. This, of course, is a value judgment. There is no bright line rule for assessing whether the perpetuation of segregation is legally significant.

NYCHA contends that the WFP's effect on white population decline is too minor to be characterized as significant and do not outweigh the WFP's undisputed salutary effects. According to Dr. Cupingood, for 13 of the 21 projects, the difference in white decline with the WFP in effect over five years would be 4 percent or less. At the remaining eight projects, the difference in white decline ranges from 5.4 percent to 10.7 percent. Citing such cases as Huntington, 844 F.2d at 934, and Metropolitan Housing, 558 F.2d at 1291, NYCHA concludes that "federal courts have much larger discrepancies in mind when they speak of 'legally significant' effects than the few percentage-point differences involved here." (Defendants' Brief at 21).

While the Authority is correct that many of the cases cited by the parties involve larger discrepancies than in the instant

19. Over ten years, assuming historical turnover rates for each race, the WFP would increase white move-ins from 1,217 to approximately 2,240—an increase of 1,023 white move-ins. The difference represents 21.92 standard deviation units.

case, "small" percentage-point differences can result in significant perpetuation of segregation. At the Pomonok project, for example, where the WFP would increase the white occupancy rate by 3.2 percentage points after five years, and 5.5 percentage points after ten years, (*see* Cupingood Third Aff. Tables 4 and 6), every percentage point increase in the white population means relinquishing 20 apartments to white families that would have gone to African–American and Hispanic families. At Pomonok alone, the WFP would deprive non-white families of 66 apartments after five years (*see id.* Table 5) and 114 apartments after ten years (*see id.* Table 7).

The cumulative effect of the WFP on the Disproportionate Projects is particularly striking. After five years, there would be approximately 514 additional white families at these 21 projects, and after ten years there would be more than 1,023 white families.[20]

These figures are significant in sheer magnitude. *See Sarabia,* 601 F.2d 914. Perhaps more importantly, they are significant to the families affected. To be sure, the WFP has numerous benefits, but with respect to the Disproportionate Projects, these are outweighed by its adverse effects.[21] The WFP markedly inhibits the rate at which desegregation will occur, adversely affects the ratios at the Disproportionate Projects, and contravenes the purposes of the Consent Decree. In short, the WFP significantly perpetuates segregation.

Accordingly, the NYCHA is enjoined from implementing the WFP at the 20 relevant developments.[22]

### Conclusion

For the reasons set forth above, the motion of the Davis Plaintiffs is granted and the preliminary injunction is made permanent. The NYCHA's motion is denied.

It is so ordered.

20. The extent to which the WFP would impair desegregation can also be measured by the percentage by which the WFP would reduce changes in white population. For example, at Robbins Plaza, without the WFP in place and assuming that historical turnover rates by race continue, the white population after five years would fall by 16 families. With the WFP, it would fall by only two families, a difference of 87.5 percent. (*See* Cupingood Third Aff. ¶ 15).

21. NYCHA asserts that this Court's injunction has caused increases in the number of homeless and very poor families at the Disproportionate Projects. The WFP went into operation in 1998 except at the Disproportionate Projects where is was enjoined. According to NYCHA's most recent data book, during 1998, the number of families at the Disproportionate Projects on "full welfare" decreased by 271 families, from 11.3 percent to 9.3 percent of the population. The number of families in which at least one family member receives welfare decreased by 313 families. Significantly, the number of families at the Disproportionate Projects is markedly lower than in NYCHA's system as a whole. (*See* Cupingood Fourth Aff. ¶ 28).

22. As noted, there are now 20 out of the NYCHA's 322 projects subject to this Court's injunction.